UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARSH USA LLC,

                Plaintiff,

    V.

AON RISK SERVICES COMPANIES, INC.,
ROBERT MCDONOUGH, and DANNY
HALL

                Defendants.

Case No. 1:25-cv-3241-JAH-HJR

**AMENDED COMPLAINT**

Plaintiff Marsh USA LLC (f/k/a Marsh USA Inc.) ("Marsh" or the "Company"), by and through its counsel, Gibson, Dunn & Crutcher LLP, file this Amended Complaint against Defendants Aon Risk Services Companies, Inc. ("Aon"), Robert McDonough ("McDonough"), and Danny Hall ("Hall") (collectively, the "Defendants"), and in support thereof, would respectfully show the Court as follows:

**INTRODUCTION**

1.     The seeds of this action were sown in January 2025 when Aon—a direct competitor of Marsh—lost a team of employees from its surety business to another competitor. Rather than invest the time and money to rebuild its surety practice piece by piece, Aon opted for a quicker, unlawful fix: simply pluck a full team from Marsh's Construction Surety business unit to fill its need, in violation of Marsh's legal rights. Defendants' scheme resulted in a brazen taking of the core of Marsh's Construction Surety business—its confidential information, its employees and its clients.

2.     Aon first set its sights on luring away Marsh's Construction Surety leadership, including its senior leader, McDonough. With the help of McDonough, Aon identified and recruited key members of Marsh's Construction Surety team, along the way improperly using Marsh's confidential personnel and compensation information. Defendants' raid of Marsh's

Construction Surety unit culminated in the coordinated resignation of **20 employees** (the "Departing Employees") **in the span of just 38 minutes** on March 10, 2025.

3.     Each of the following Departing Employees worked in Marsh's Construction Surety group and owe contractual duties to Marsh, including to protect Marsh's confidential business information and in many cases to refrain from unfairly competing with or soliciting other employees to compete with Marsh.

Defendant Robert McDonough, Construction Practice Leader

Defendant Danny Hall, Sr. Client Advisor

Brian Hodges, U.S. Surety Leader

Daniel Machado, National Growth Leader Surety/SDI

Nicole Spina, Assoc. Client Advisor

Jim Cuthbertson, Central Zone Leader

Christina Johnson, Sr. Client Advisor

Regina Adler, Sr. Leader, Claims Advocacy

Keith Jurss, Northeast Zone Leader

Christopher Davis, Advisory & Growth Leader, Project Risk

Ann Mullins, Client Advisor

Sharon Potts, U.S. Contract Surety Leader

Jeffrey Strassner, West Zone Leader

Conor Casey, Northeast Zone Leader

Barbie Norton, Client Advisor

Frank Kilburg, Account Executive

Thomas Noonan, Sr. Client Advisor

Vanessa Sugg, Client Advisor

Michael Roark, West Zone Leader

Avi Khanna, Operations/Innovation

4.      Defendants' scheme did not stop at poaching Marsh employees; it also targeted established Marsh clients as well.  Both before and after the mass resignation, Aon, McDonough, Hall, and the other Departing Employees solicited and/or attempted to solicit Marsh clients to move their business to Aon, again using Marsh's confidential information in the process.  Notably, ***the day after the mass exodus***—March 11, 2025—one of Marsh's longstanding clients, whose primary contact at Marsh was McDonough, announced that it was moving its business to Aon and even copied McDonough on that correspondence.  Since then, other Marsh clients have followed suit, announcing plans to move their business to Aon.  Additionally, just days after his defection, McDonough sent a call invitation on behalf of Aon to a client to discuss a project on which he had worked extensively while employed by Marsh.

5.      Critical to their illicit plan, McDonough, Hall, and the other Departing Employees misappropriated and misused Marsh's confidential information, including but not limited to sensitive client, employee and personnel information, for the benefit of Aon.  This confidential information is and was protected from disclosure pursuant to McDonough, Hall, and the other Departing Employees' legal and contractual obligations to Marsh.  In one pointed example, while still employed by Marsh, McDonough disclosed to Aon confidential information regarding Marsh's ongoing discussions with a job candidate then employed by Aon.  McDonough's demonstrated disloyalty to his employer—Marsh—in favor of his intended future employer—Aon—was not an isolated event in the weeks preceding his departure and exceeded merely planning for a change in his employment.

6.      Rather, both during and after his employment with Marsh, McDonough has repeatedly violated his contractual and legal obligations to Marsh.  While on Marsh's payroll and with access to highly sensitive employee data, including compensation information, McDonough convinced a select group of hand-picked Marsh colleagues to defect to Aon, directly and indirectly solicited Marsh clients to move their business to Aon, and misused and disclosed Marsh's confidential information—all for the benefit of their future, now current, employer Aon.  And Aon, in its own right and through the conduct of McDonough and others, knowingly facilitated and

encouraged the violation of the duties and contractual obligations of McDonough and other Departing Employees.

7.     Hall likewise intentionally violated his contractual and legal obligations to Marsh. For example, in the week leading up to his resignation, Hall repeatedly accessed sensitive information—including Marsh trade secrets—related to a Marsh client.  Then, that same client announced shortly after Hall and the other Departing Employees' resignations, that it would be moving its surety business from Marsh to Aon.  On information and belief, Hall used Marsh's confidential information to solicit this client's business from Marsh to Aon.

8.     Defendants must be held to account for their actions and the resulting damage to Marsh's business.

9.     Defendants' actions forced Marsh to commence this suit to end Defendants' ongoing misconduct and to remedy the harm already inflicted on Marsh.  Defendants conspired to steal the core of Marsh's top-tier Construction Surety business unit for the benefit of Aon and are competing unfairly and in violation of McDonough's contractual duties and other legal obligations. Marsh therefore seeks reparation for the harm Defendants have inflicted.

## THE PARTIES

10.     Founded in 1871, Marsh is a leading insurance brokerage and risk management firm.  Marsh provides an array of services for its clients, including insurance brokering, consulting, and claims advocacy services.  Marsh is a Delaware limited liability company with its principal place of business in New York, New York.

11.     Defendant Aon Risk Services Companies, Inc. is a corporation existing under Maryland law, with its principal place of business in Illinois.  On information and belief, Aon does business and maintains offices throughout the United States, including in New York, where it is registered to do business and maintains an office located at One Liberty Plaza, 165 Broadway, New York, NY 10006.  Like Marsh, Aon is in the business of providing insurance brokerage and risk management services.  Marsh and Aon are direct competitors.

12.     Defendant McDonough was employed by Marsh in its Construction Surety business unit ("Construction Surety") working out of Marsh's New York office and executed binding agreements in connection with his employment, which included, *inter alia*, client and employee non-solicitation covenants and non-disclosure covenants.

13.     McDonough is a natural person who resides and is domiciled in the state of New Jersey.  McDonough began his employment at Marsh on March 31, 2016.  Before commencing his employment with Marsh, on March 11, 2016, McDonough executed various agreements with Marsh, including a Confidentiality Agreement, attached hereto as **Exhibit A**, a Non-Solicitation Agreement, attached hereto as **Exhibit B**, an Offer Letter, attached hereto as **Exhibit C**, and a Supplemental Terms and Conditions of Employment Agreement, attached hereto as **Exhibit D**.  In addition, on March 21, 2024, McDonough agreed to the terms of a Grant Agreement, attached hereto as **Exhibit E**.

14.     Defendant Hall was employed by Marsh in Construction Surety, working remotely from Lexington, Kentucky, and executed binding agreements in connection with his employment, which included, *inter alia*, client and employee non-solicitation covenants and non-disclosure covenants.

15.     Hall is a natural person who resides and is domiciled in the state of Kentucky.  Hall began his employment at Marsh on June 6, 2022.  Before commencing his employment with Marsh, on May 18, 2022, Hall executed an Offer Letter with Marsh, attached hereto as **Exhibit F**, containing various agreements, including a Confidentiality Agreement, a Non-Solicitation Agreement, and a Supplemental Terms and Conditions of Employment Agreement.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship among the parties and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of costs and interest.

17.     This Court also has subject matter jurisdiction over Marsh's claims under 28 U.S.C. § 1333 and 28 U.S.C. § 1367 because the Amended Complaint alleges a claim for misappropriation

of trade secrets under the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1832 *et seq.*, and Marsh's other claims are so related to its federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

18.    This Court has personal jurisdiction over Aon because Aon conducts business in this District and has committed tortious acts within the State of New York or has directed its tortious conduct toward the State of New York.

19.    This Court has personal jurisdiction over McDonough because he consented to the jurisdiction of this Court in his Confidentiality Agreement, Non-Solicitation Agreement, Supplemental Terms and Conditions of Employment, and Grant Agreement. *See* Exs. A § 6(h) ("[T]he parties agree that any action or proceeding with respect to this Agreement and my employment shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York and the parties agree to the jurisdiction thereof."); B § 11 ("The parties . . . agree that any action or proceeding with respect to this Agreement and Employee's employment shall be brought exclusively in the Civil Court of the City of New York, New York County, or in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York and the parties agree to the jurisdiction thereof."); D ("Any disputes under the Offer Letter and these Terms & Conditions or any action for enforcement of the Offer Letter and these Terms & Conditions will be brought in any federal or state court located in the County of New York, New York, and such courts will have exclusive jurisdiction over any such dispute or action. By your acceptance of the Offer Letter, you agree to submit to the jurisdiction of such courts."); and E § 12 ("The parties . . . agree that any action or proceeding with respect to this Agreement and the Employee's employment shall be brought exclusively in the Civil Court of the City of New York, New York County, or in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York, or in any other court of competent jurisdiction in or for the State and County of New York, and the parties agree to the personal jurisdiction thereof.").

20.    This Court also has specific jurisdiction over McDonough because he transacted business with Marsh—which maintains its principal place of business in New York, New York—and worked in Marsh's New York office, and Marsh's claims arise in whole or in part from those transactions.

21.    This Court has personal jurisdiction over Hall because he consented to the jurisdiction of this Court in his Confidentiality Agreement, Non-Solicitation Agreement, and Supplemental Terms and Conditions of Employment.  *See* Exs. F § 6(h) ("[T]he parties agree that any action or proceeding with respect to this Agreement and my employment shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York and the parties agree to the jurisdiction thereof."); F, Non-Solicitation Agreement § 12 ("The parties . . . agree that any action or proceeding with respect to this Agreement and Employee's employment shall be brought exclusively in the Civil Court of the City of New York, New York County, or in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York, or in any other court of competent jurisdiction in or for the State and County of New York, and the parties agree to the personal jurisdiction thereof."); and F, Supplemental Terms and Conditions of Employment ("Any disputes under the Offer Letter and these Terms & Conditions or any action for enforcement of the Offer Letter and these Terms & Conditions will be brought in any federal or state court located in the County of New York, New York, and such courts will have exclusive jurisdiction over any such dispute or action. By my acceptance of the Offer Letter, I agree to submit to the jurisdiction of such courts.").

22.    This Court also has specific jurisdiction over Hall because he transacted business with Marsh—which maintains its principal place of business in New York, New York—and Marsh's claims arise in whole or in part from those transactions.

23.    Venue is proper in this District under 28 U.S.C. § 1391 because Marsh maintains its principal place of business in this District, a substantial part of the events or omissions giving rise to this action occurred in this District, and because Defendant McDonough consented to venue

in this District in his Confidentiality Agreement, Non-Solicitation Agreement, and Grant Agreement. *See, e.g.*, Exs. A § 6(h) ("The parties hereby irrevocably waive any objection they may now or hereafter have to the laying of venue of any such action in the said court(s), and further irrevocably waive any claim they may now or hereafter have that any such action brought in said court(s) has been brought in an inconvenient forum."); B § 11 (same); E § 12 (same); F, Confidentiality Agreement § 6(h) (same); and *id.*, Non-Solicitation Agreement § 12 (same).

## FACTUAL BACKGROUND

I.    **Marsh Built its National Construction Practice into a Leader in the Construction Surety Industry Through Significant Investments in its Trade Secrets and Employees.**

24.    Marsh is a leading international insurance brokerage and risk management firm and its national Construction Surety practice is a leader in the surety and construction space.

25.    Employees in the Construction Surety group utilize Marsh's global reach and proprietary insights to develop their niche practice.  In order to do so, Marsh provides the employees in this business unit with access to significant commercially sensitive and confidential information and trade secrets that Marsh went to great lengths at enormous expense to develop, create, and refine.  Marsh's commercially sensitive and confidential information and trade secrets are not generally known to the public and are not readily ascertainable.

26.    Marsh's Construction Surety employees are provided with Marsh's confidential and trade secrets, including information about clients, prospective clients, growth opportunities, pricing, and terms and conditions of contracts with clients.  These employees, and particularly McDonough as a leader, also have intimate knowledge of confidential and proprietary information and trade secrets concerning Marsh's workforce, including employees' relative strengths and areas of expertise, relationships with current or potential clients, and recruitment and hiring efforts.

27.    This information also is vital to the success of Marsh, as information about Marsh's workforce, current and prospective clients, competitive pricing, and growth opportunities are of paramount importance in this highly competitive industry and provide Marsh with significant competitive advantages.

28.     Marsh's Construction Surety employees also have access to confidential and trade secret proprietary tools, data, and methodologies developed by Marsh that provide Marsh with competitive advantages over others in the construction surety business.

29.     In this highly competitive industry, sensitive and confidential information and trade secrets about prospective clients, competitive pricing, and growth opportunities are of paramount importance.    Marsh has put into place protocols and measures to protect its confidential information and trade secrets and to protect its business against unfair competition.   Among other measures, Marsh requires its employees, including McDonough and Hall, to sign various agreements to protect this critical information such as non-solicitation and confidentiality agreements.   Marsh provided this information to employees on a need-to-know basis only.   Marsh also regularly reminded employees of the important need to keep this information confidential, including in its employee handbook, *Working Here* (the "Handbook"), Code of Conduct, and other employment-related training.   And Marsh password protected access to this information.

30.     For example, per Marsh's Code of Conduct, Marsh employees are instructed, among other things, to refrain from discussing or coordinating with competitors on inappropriate matters, including fee and commission levels, strategic plans and how Marsh wins business. Further, Marsh employees are to refrain from sharing Marsh's competitively sensitive information with a competitor, to use and disclose Marsh's information only for legitimate business purposes, and to protect intellectual property and confidential Marsh information by sharing it only with authorized parties.

## II.    Marsh Invested Resources in Employing, Training, and Developing the Departing Employees.

31.     Marsh invested significant resources and expertise in training and developing the Departing Employees, including providing them with extensive training, client development resources, and cross-selling opportunities.   Defendants' coordinated corporate raid of 20 core members of Marsh's Construction Surety team significantly diminished Marsh's business by

appropriating the value of those substantial investments and the associated talent and client knowledge.

32.    All of the Departing Employees had access to Marsh's confidential information and trade secrets, as detailed herein.

**Defendants**

*Defendant Robert McDonough*

33.    On March 31, 2016, McDonough joined Marsh's Construction Surety team in New York as the Construction Practice Leader (which included Surety) and he maintained that senior leadership role for nearly a decade.  McDonough reported to Richard Gurney, Global Head of Marsh's Construction Practice, and indirectly reported to Marsh's CEO.

34.    As the leader of the Construction Surety group, McDonough was responsible for overseeing all activities across the unit.  He had extensive management responsibilities and was involved in some capacity in all of the Construction Surety group's initiatives, business offerings, and client relationships.  McDonough met with Marsh executives as the representative and leader of Construction Surety.  McDonough also managed 10 direct reports in the business unit. McDonough was privy to confidential information about Marsh employees' compensation and bonus awards.  For example, he was previously involved in coordinating retention efforts, including preparing retention award offers, for some of the very same employees he later solicited to Aon.  In addition, McDonough had significant, daily interactions with Marsh clients and potential clients.

35.    McDonough held a position of influence and trust within Marsh with accompanying responsibilities.  As a result, McDonough was privy to Marsh's highly confidential information and trade secrets, including information related to Marsh's workforce and clients.

36.    McDonough led the mass resignation on March 10, 2025, submitting his resignation at 10:45 a.m.  Nineteen others would follow McDonough's lead, including 70% of McDonough's direct reports.  McDonough and these 19 other Marsh employees all went to work at Aon.

*Defendant Danny Hall*

37.    From June 6, 2022 until his resignation on March 10, 2025, Hall worked for Marsh in Lexington, Kentucky.

38.    Most recently, Hall held the role of Senior Client Advisor, which meant Hall had access to confidential information about Marsh's clients, markets, and personnel.

39.    After he resigned from Marsh, Hall went to work for Aon, performing the same work he performed at Marsh.

**Other Departing Employees**

*Brian Hodges ("Hodges")*

40.    From October 4, 2021 until his resignation on March 10, 2025, Marsh employed Hodges in its Towson, Maryland office.  Most recently, Hodges served as U.S. Surety Leader and was involved in some capacity in all of Marsh's Construction Surety group's initiatives, business offerings, and client relationships.  Due to his role, Hodges held a position of influence and trust within the Construction Surety group.  Hodges had access to highly confidential information, including client information, and worked closely with many Marsh employees, including the Departing Employees.  In addition, Hodges had significant, daily interactions with Construction Surety clients and potential clients.

*Daniel Machado ("Machado")*

41.    From July 30, 2018 until his resignation on March 10, 2025, Marsh employed Machado in its Denver, Colorado office.  Most recently, Machado served as the National Growth Leader Surety/SDI.  As National Growth Leader Surety/SDI, Machado had access to confidential information about Marsh's clients, markets, and personnel.

*Nicole Spina ("Spina")*

42.    From August 2, 2021 until her resignation on March 10, 2025, Marsh employed Spina in its New York, New York office.  Before her resignation, Spina held the position of an Associate Client Advisor at Marsh, which granted her access to confidential information about Marsh's clients, markets, and personnel.

*Jim Cuthbertson ("Cuthbertson")*

43.    From January 10, 2018 until his resignation on March 10, 2025, Marsh employed Jim Cuthbertson in its Denver, Colorado office.  Most recently, Cuthbertson was employed as the Central Zone Leader.  As Central Zone Leader, Cuthbertson had access to confidential information about Marsh's clients, markets, and personnel.

*Christina Johnson ("Johnson")*

44.    From October 3, 2022 until her resignation on March 10, 2025, Johnson worked at Marsh's Los Angeles, California office.  Most recently, Johnson was employed as a Senior Client Advisor and had access to confidential information about Marsh's clients, markets, and personnel.

*Regina Adler ("Adler")*

45.    From July 26, 2021 until her resignation on March 10, 2025, Marsh employed Adler in its Los Angeles, California office.  Adler was employed as a Senior Leader, Claims Advocacy, and as such, Adler had access to confidential information about Marsh's clients, markets, and personnel.

*Keith Jurss ("Jurss")*

46.    From April 20, 2021 until his resignation on March 10, 2025, Marsh employed Jurss in its Boston, Massachusetts office.  Prior to his resignation, Jurss worked as Northeast Zone Leader.  Through this position, Jurss had access to confidential information about Marsh's clients, markets, and personnel.

*Christopher Davis ("Davis")*

47.    From May 19, 2003 until his resignation on March 10, 2025, Marsh employed Davis in its Sacramento, California office.  Most recently, Davis was employed as the Advisory & Growth Leader for Project Risk, which meant that Davis had access to confidential information about Marsh's clients, markets, and personnel.

*Ann Mullins ("Mullins")*

48.    From August 26, 2019 until her resignation on March 10, 2025, Marsh employed Mullins in its Chicago, Illinois office.  Mullins was employed as a Client Advisor and, as a result, was permitted access to confidential information about Marsh's clients, markets, and personnel.

*Sharon Potts ("Potts")*

49.    From March 19, 2013 until her resignation on March 10, 2025, Marsh employed Potts in its Atlanta, Georgia office.  Most recently, Potts was employed as a U.S. Contract Surety Leader.  As U.S. Contract Surety Leader, Potts had access to confidential information about Marsh's clients, markets, and personnel.

*Jeffrey Strassner ("Strassner")*

50.    From May 21, 2019 until his resignation on March 10, 2025, Strassner worked in Marsh's Denver, Colorado office.  Most recently, Strassner was employed as West Zone Leader. As West Zone Leader, Strassner had access to confidential information about Marsh's clients, markets, and personnel.

*Conor Casey ("Casey")*

51.    From April 4, 2016 until his resignation on March 10, 2025, Marsh employed Casey in its New York, New York office.  Casey was employed as the Northeast Zone Leader and, in connection with his position, Marsh provided Casey with access to confidential information about Marsh's clients, markets, and personnel.

*Barbie Norton ("Norton")*

52.    From March 23, 2020 until her resignation on March 10, 2025, Marsh employed Norton in its Houston, Texas office.  Most recently, Norton was a Client Advisor.  As a Client Advisor, Norton had access to confidential information about Marsh's clients, markets, and personnel.

*Frank Kilburg ("Kilburg")*

53.     From May 24, 2021 until his resignation on March 10, 2025, Kilburg worked in Marsh's Boston, Massachusetts office as an Account Executive.  As an Account Executive, Kilburg had access to confidential information about Marsh's clients, markets, and personnel.

*Thomas Noonan ("Noonan")*

54.     From March 31, 2016 until his resignation on March 10, 2025, Marsh employed Noonan in its New York, New York office.  Most recently, Noonan was employed as a Senior Client Advisor.  As a Senior Client Advisor, Noonan had access to confidential information about Marsh's clients, markets, and personnel.

*Vanessa Sugg ("Sugg")*

55.     From July 24, 2023 until her resignation on March 10, 2025, Marsh employed Sugg in its Southfield, Michigan office.  Most recently, Sugg was employed as a Client Advisor, a position which granted Sugg access to confidential information about Marsh's clients, markets, and personnel.

*Michael Roark ("Roark")*

56.     From June 18, 2018 until his resignation on March 10, 2025, Marsh employed Roark in its Denver, Colorado office.  Roark worked as West Zone Leader up until his resignation. As West Zone Leader, Roark had access to confidential information about Marsh's clients, markets, and personnel.

*Avi Khanna ("Khanna")*

57.     From August 23, 2021 until his resignation on March 10, 2025, Marsh employed Khanna in its Boston, Massachusetts office.  Khanna was employed as the leader of Marsh Operations/Innovations team, which necessitated his access to confidential information about Marsh's clients, markets, and personnel.

### III.    McDonough and Hall Owed Contractual Obligations to Marsh Relating to Marsh's Employees, Clients, Confidential Information, and Trade Secrets.

58.    To protect its essential investments in its employee and client relationships and to safeguard the confidentiality of its trade secrets and confidential information, Marsh required McDonough and Hall to execute multiple industry-standard agreements, including Confidentiality Agreements, Non-Solicitation Agreements, and Supplemental Terms and Conditions of Employment Agreement, (the "Agreements").[1] *See* Exs. A–F.  The Agreements contain restrictive covenants and are governed by New York law.  *Id.*

**Confidentiality Agreements**

59.    In connection with and as a condition of their employment, McDonough and Hall signed Confidentiality Agreements.  *See* Exs. A; F, Confidentiality Agreement.

60.    Under their respective Confidentiality Agreements, McDonough and Hall have clear and straightforward obligations to protect Marsh's confidential information and trade secrets:

Nondisclosure of Confidential Information and Trade Secrets

I acknowledge and agree that the Company is engaged in a highly competitive business and that its competitive position depends upon its ability to maintain the confidentiality of the Confidential Information and Trade Secrets which were developed, compiled and acquired by the Company at its great effort and expense.  I further acknowledge and agree that any disclosing, divulging, revealing, or using of any of the Confidential Information and Trade Secrets, other than in connection with the Company's business or as specifically authorized by the Company, will be highly detrimental to the Company and cause it to suffer serious loss of business and pecuniary damage.  Accordingly, I agree that I will not, while associated with the Company and for so long thereafter as the pertinent information or documentation remains confidential, for any purpose whatsoever, directly or indirectly use, disseminate or disclose to any other person, organization or entity Confidential Information or Trade Secrets, except as required to carry out my duties as an employee of the Company, and except as expressly authorized by the President or highest executive officer of the Company.  I understand that nothing in this Agreement is intended to prohibit me from discussing with other employees, or with third parties who are not future employers or competitors of the Company, wages, hours, or other terms and conditions of employment.

---

[1] McDonough's Offer Letter, signed on March 11, 2016, references his obligations set forth in the Confidentiality Agreement, Non-Solicitation Agreement, and Supplemental Terms and Conditions of Employment Agreement, *see* Ex. C.  Hall's Offer Letter, signed on May 18, 2022, contains his Confidentiality Agreement, Non-Solicitation Agreement, and Supplemental Terms and Conditions of Employment Agreement obligations, *see* Ex. F.

Exs. A § 3; F, Confidentiality Agreement § 3.

61.     Under the Confidentiality Agreement, "Confidential Information and Trade Secrets" explicitly include:

(i)     financial and business information relating to the Company, such as information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures, and new marketing ideas;

(ii)    product and technical information relating to the Company, such as product formulations, new and innovative product ideas, methods, procedures, devices, machines, equipment, data processing programs, software, software codes, computer models, and research and development projects;

(iii)   client information, such as the identity of the Company's clients, the names of representatives of the Company's clients responsible for entering into contracts with the Company, the amounts paid by such clients to the Company, specific client needs and requirements, specific client risk characteristics, policy expiration dates, policy terms and conditions, information regarding the markets or sources with which insurance is placed, and leads and referrals to prospective clients;

(iv)    personnel information, such as the identity and number of the Company's other employees, their salaries, bonuses, benefits, skills, qualifications, and abilities.

(v)     any and all information in whatever form relating to any client or prospective client of the Company, including but not limited to, its business, employees, operations, systems, assets, liabilities, finances, products, and marketing, selling and operating practices;

(vi)    any information not included in (i) or (ii) above which I know or should know is subject to a restriction on disclosure or which I know or should know is considered by the Company or the Company's clients or prospective clients to be confidential, sensitive, proprietary or a trade secret or is not readily available to the public;

(vii)   Intellectual Property (as defined below); and

(viii)  Copyrightable Works (as defined below).

Exs. A, Schedule § 6(l); F, Confidentiality Agreement, Schedule 1(a).

62.     Further, as stated in the Confidentiality Agreements, "Confidential Information and Trade Secrets are not generally known or available to the general public, but have been developed, compiled or acquired by the Company at its great effort and expense." *Id.*    Additionally,

"Confidential Information and Trade Secrets can be in any form: oral, written or machine readable, including electronic files." *Id.*

63.    As part of the Confidentiality Agreements, McDonough and Hall also agreed to be bound by a provision requiring the return of Marsh property upon the termination of their employment.

64.    McDonough agreed to the following provision:
<u>Return of Materials Upon Termination of Employment</u>
Immediately upon the termination of my employment with the Company for any reason, or at any time the Company so requests, I will return to the Company:

a. any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports, lists of the Company's clients or leads or referrals to prospective clients, and other media or property in my possession or control which contain or pertain to Confidential Information or Trade Secrets; and

b. all property of the Company, including, but not limited to, supplies, keys, access devices, books, identification cards, computers, telephones and other equipment.

I agree that upon my completion of the obligations set forth in this Section 4, paragraphs a. & b. above and if requested by the Company, I will execute a statement declaring that I have retained no property of the Company or materials containing Confidential Information nor have I supplied the same to any person, except as required to carry out my duties as an employee of the Company. A receipt signed by a Principal of the Company itemizing the returned property is necessary to demonstrate that I have returned all such property to the Company.

Ex. A § 4.

65.    Hall agreed to a similar provision:

<u>Return of Materials Upon Termination of Employment</u>

a. Immediately upon the termination of my employment with the Company for any reason, or at any time the Company so requests, I will return to the Company:

i. any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks or drives or other equipment, printouts, reports, lists of the Company's clients or leads or referrals to prospective clients, and other media or property in my possession or control which contain or pertain to Confidential Information and Trade Secrets; and

ii. all property of the Company, including, but not limited to, supplies, keys, access devices, books, identification cards, computers, telephones and other equipment, including all

passcodes or passwords associated with such equipment.  For any equipment or devices owned by me on which proprietary information of the Company is stored or accessible, I shall, immediately upon or prior to separation from employment, deliver such equipment or devices to the Company so that any proprietary information may be deleted or removed. I expressly authorize the Company's designated representatives to access such equipment or devices for this limited purpose and shall provide any passwords or access codes necessary to accomplish this task.

b. I agree that upon my completion of the obligations set forth in subsection 4a, paragraphs i. & ii. above and if requested by the Company, I will execute a statement declaring that I have retained no property of the Company or materials containing Confidential Information and Trade Secrets nor have I supplied the same to any person, except as required to carry out my duties as an employee of the Company.  A receipt signed by a Human Resources officer of the Company itemizing the returned property is necessary to demonstrate that I have returned all such property to the Company.

Ex. F, Confidentiality Agreement § 4.

**Non-Solicitation Agreements**

66.    In connection with and as a condition of employment, McDonough and Hall signed Non-Solicitation Agreements.  *See* Exs. B; F, Non-Solicitation Agreement.

67.    In the Non-Solicitation Agreements, McDonough and Hall agreed to be bound by non-solicitation covenants prohibiting the solicitation of Marsh clients and employees for a period of one year following termination.

68.    Specifically, in exchange for access to Marsh's confidential information and trade secrets relating to Marsh's clients and prospective clients, McDonough agreed to be bound by the following non-solicitation covenant prohibiting the direct or indirect solicitation of Marsh clients:

Non-Solicitation Of Clients

(a) Employee acknowledges and agrees that solely by reason of employment by the Company, Employee has and will come into contact with and develop and maintain relationships with a significant number of the Company's clients and prospective clients, and will have access to Confidential Information and Trade Secrets relating thereto, including those regarding the Company's clients, prospective clients and related information.

(b) Consequently, Employee covenants and agrees that in the event of separation from

employment with the Company, whether such separation is voluntary or involuntary, Employee will not, for a period of twelve (12) months following such separation, directly or indirectly: (i) solicit clients or prospective clients of the Company for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by the Company; (ii) induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company; (iii) perform or supervise the provision or performance of services or provision of products of the type sold or provided by Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company; or (iv) assist others to do the acts specified in Sections 1 (b) (i)-(iii). This restriction shall apply only to those clients or prospective clients of the Company with which Employee had contact or about which Employee obtained Confidential Information and Trade Secrets during the last two (2) years of his or her employment with the Company. For the purposes of this Section 1, the term "contact" means interaction between Employee and the client which takes place to further the business relationship, or making (or assisting or supervising the performance or provision of) sales to or performing or providing (or assisting or supervising the performance or provision of) services or products for the client on behalf of the Company. For purposes of this Section 1, the term "contact" with respect to a "prospective" client means interaction between Employee and a potential client of the Company which takes place to obtain the business of the potential client on behalf of the Company. It shall not be a defense to a claim that this Section has been breached that Employee's new employer or entity for which Employee is performing services has previously solicited or served the client. Employee shall not engage in any subterfuge to circumvent this prohibition, including, but not limited to accompanying others on calls to the client, contacting the client with other persons, supervising other persons in soliciting or serving the client, providing Confidential Information and Trade Secrets to others to assist them in soliciting or serving the client, participating in developing presentations to be made to the client, or other similar activities.

Ex. B § 1.

69.    Like McDonough, Hall agreed to be bound by a non-solicitation covenant prohibiting the solicitation, directly or indirectly, of Marsh clients in exchange for access to Marsh's confidential information and trade secrets relating to Marsh's clients and prospective clients:

Non-Solicitation Of Clients

(a) Employee acknowledges and agrees that solely by reason of employment by the Company, Employee has and will come into contact with and develop and maintain relationships with a significant number of the Company's clients and prospective clients, and will have access to Confidential Information and Trade Secrets relating thereto, including those regarding the Company's clients, prospective clients and related information, and will have access to and the benefit of good will developed by Company

with its clients.

(b) Consequently, Employee covenants and agrees that in the event of separation from employment with the Company, whether such separation is voluntary or involuntary, Employee will not, for a period of twelve (12) months following such separation, directly or through others: (i) solicit clients or prospective clients of the Company for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by the Company; (ii) induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company; (iii) perform or supervise the provision or performance of services or provision of products of the type sold or provided by Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company; or (iv) assist others to do the acts specified in Sections 1(b) (i)-(iii). This restriction shall apply only to those clients or prospective clients of the Company with which Employee had contact or about which Employee obtained Confidential Information and Trade Secrets during the last two (2) years of his or her employment with the Company or its predecessors. For the purposes of Section 1, the term "contact" means interaction between Employee and the client which takes place to further the business relationship, or making (or assisting or supervising the performance or provision of) sales to or performing or providing (or assisting or supervising the performance or provision of) services or products for the client on behalf of the Company. For purposes of Section 1, the term "contact" with respect to a "prospective" client means interaction between Employee and a potential client of the Company which takes place to obtain the business of the potential client on behalf of the Company. It shall not be a defense to a claim that this Section has been breached that Employee's new employer or entity for which Employee is performing services has previously solicited or served the client. Employee shall not engage in any subterfuge to circumvent this prohibition, including, but not limited to accompanying others on calls to the client, contacting the client with other persons, supervising other persons in soliciting or serving the client, providing Confidential Information and Trade Secrets to others to assist them in soliciting or serving the client, participating in developing presentations to be made to the client, or other similar activities.

Ex. F, Non-Solicitation Agreement § 2.

70.    McDonough agreed to be bound by the following non-solicitation covenant prohibiting the direct and indirect solicitation of Marsh employees:

Non-Solicitation Of Employees

Employee acknowledges and agrees that solely as a result of employment with the Company, and in light of the broad responsibilities of such employment which include working with other employees of the Company, Employee has and will come into contact with and acquire Confidential Information and Trade Secrets regarding the Company's other employees. Accordingly, both during employment with the Company and for a period of twelve (12) months thereafter, Employee shall not, either on Employee's own account or on behalf of any person, company, corporation, or other entity, directly or indirectly,

solicit, or endeavor to cause any employee of the Company with whom Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom Employee obtained Confidential Information and Trade Secrets, to leave employment with the Company.

Ex. B § 2.

71.    Hall agreed to be bound by the following similar non-solicitation covenant

prohibiting the direct and indirect solicitation of Marsh employees:

Non-Solicitation Of Employees

Employee acknowledges and agrees that solely as a result of employment with the Company, and in light of the broad responsibilities of such employment which include working with other employees of the Company, Employee has and will come into contact with and acquire Confidential Information and Trade Secrets regarding the Company's other employees. Accordingly, both during employment with the Company and for a period of twelve (12) months thereafter, Employee shall not, either on Employee's own account or on behalf of any person, company, corporation, or other entity, directly or through others, solicit, or endeavor to cause any employee of the Company with whom Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom Employee obtained Confidential Information and Trade Secrets, to leave employment with the Company.

Ex. F, Non-Solicitation Agreement § 3.

72.    In his Non-Solicitation Agreement, McDonough also agreed to be bound by a

conflict of interest provision:

Conflict Of Interest

Employee may not use his or her position, influence, knowledge of Confidential Information and Trade Secrets or the Company's assets for personal gain except as specifically provided in this Agreement. A direct or indirect financial interest, including joint ventures in or with a supplier, vendor, client or prospective client without disclosure and the express written approval of the President or highest executive officer of Employer is strictly prohibited and constitutes cause for dismissal.

Ex. B § 3.

73.    Likewise, in his Non-Solicitation Agreement, Hall also agreed to be bound by a

conflict of interest provision:

<u>Conflict Of Interest</u>

Employee may not use his or her position, influence, knowledge of Confidential Information and Trade Secrets or the Company's assets for personal gain except as specifically provided in this Agreement. A direct or indirect financial interest, including joint ventures in or with a supplier, vendor, client or prospective client without disclosure and the express written approval of the President or highest executive officer of Employer is strictly prohibited and constitutes cause for dismissal.

Ex. F, Non-Solicitation Agreement § 4.

74.    McDonough's Non-Solicitation Agreement includes a provision for liquidated damages in the event of a breach of the non-solicitation of clients, non-solicitation of employees, and/or conflict of interest provisions.

75.    Under this provision, McDonough acknowledged and agreed that Marsh will be injured by any violation of the non-solicitation of clients, non-solicitation of employees, or conflict of interest provisions, that "it will be difficult or impossible to ascertain the full amount of damages that the Company will sustain by reason of any such breach, and that accordingly the Company does not have an adequate remedy at law for any such breach." Ex. B § 6(a). Therefore, McDonough agreed that, in the event of a breach, Marsh is entitled to recover liquidated damages, in addition to all other remedies to which it is entitled. *Id.*

76.    Under the liquidated damages provision, McDonough also acknowledged that because many of Marsh's clients enjoy long term business relationships with Marsh that have been fostered and expanded over time, "the loss of a client will therefore likely result in the loss of an increasing revenue stream to the Company from that client for a significant but indeterminate period of time into the future," extending beyond the restrictive period stated in the covenants. *Id.*

77.    Furthermore, McDonough acknowledged that a breach of his obligations under the Agreement will erode or reduce the value of the Company's investments in a way that cannot be fully calculated and force the Company to incur out-of-pocket costs which cannot be readily allocated or calculated. *Id.*

78.     As a result, McDonough agreed to the following liquidated damages in the event of a breach of the non-solicitation of clients, non-solicitation of employees, and/or conflict of interest provisions:

Liquidated Damages

--

(b) Recognizing the difficulty of calculating actual damages and acknowledging the factors set forth in Section 6(a), among other factors, in the event of a violation of Section 1, 2 or 3 resulting in a client either reducing the amount of business or canceling business with the Company and directing or redirecting such business through Employee or through any entity or person with whom Employee becomes associated, in addition to all other remedies provided herein, Employee agrees to pay the Company an amount equal to the total fees and commissions received by the Company for such business during the two (2) years prior to the breach. Said amount shall be payable to the Company no later than thirty (30) days following Employee's receipt of the Company's written statement of the total fees and commissions for that client for the prior two years. Employee acknowledges and agrees that this amount is a reasonable approximation of the damages likely to occur following a breach of Section 1, 2 or 3.

*Id.* § 6(b).

79.     The provision further provides that the liquidated damages remedy shall be in addition to such additional remedies as a Court may offer:

(c) The remedy set forth in Section 6(b) shall be in addition to and not in place of such additional remedies as a Court may order, including equitable relief to prevent further breaches or to provide further remedies. To the extent that a Court determines that Section 6(b) is not enforceable, or if the Company elects to prove its actual damages, the Court shall sever Section 6(b) and the Company shall recover its actual damages.

(d) This provision shall not affect the damages or other remedies the Company may recover from any other provisions of this Agreement.

*Id.* § 6(c)–(d).

80.     Like McDonough's agreement, Hall's Non-Solicitation Agreement includes a provision for liquidated damages in the event of a breach of the non-solicitation of clients.

81.     Under this provision, Hall agreed that in the event of Hall's violation of the non-solicitation of clients, Marsh will be entitled to, but not able to easily ascertain the amount of

damages for such breach. Ex. F, Non-Solicitation Agreement § 7(a). Therefore, Hall agreed that, in the event of a breach, Marsh is entitled to recover liquidated damages, in addition to all other remedies to which it is entitled. *Id.*

82.     Under the liquidated damages provision, Hall also acknowledged that because many of Marsh's clients enjoy long term business relationships with Marsh that have been fostered and expanded over time, "the loss of a client will therefore likely result in the loss of an increasing revenue stream to the Company from that client for a significant but indeterminate period of time into the future," extending beyond the restrictive period stated in the covenants. *Id.*

83.     Furthermore, Hall acknowledged that a breach of his obligations under the Agreement will erode or reduce the value of the Company's investments in a way that cannot be fully calculated and force the Company to incur out-of-pocket costs which cannot be readily allocated or calculated. *Id.*

84.     As a result, Hall agreed to the following liquidated damages in the event of a breach of the non-solicitation of clients:

Liquidated Damages

--

(b) Recognizing the difficulty of calculating actual damages and acknowledging the factors set forth in Section 7(a), among other factors, in the event of a violation of Section 2 resulting in a client either reducing the amount of business or canceling business with the Company and directing or redirecting such business through Employee or through any entity or person with whom Employee becomes associated, in addition to all other remedies provided herein, Employee agrees to pay the Company an amount equal to the total fees and commissions received by the Company for such business during the two (2) years prior to the breach. Said amount shall be payable to the Company no later than thirty (30) days following Employee's receipt of the Company's written statement of the total fees and commissions for that client for the prior two years. Employee acknowledges and agrees that this amount is a reasonable approximation of the damages likely to occur following a breach of Section 2.

*Id.* § 7(b).

85.    This provision further provides that the liquidated damages remedy shall be in addition to such additional remedies as a Court may offer:

(c) The remedy set forth in Section 7(b) shall be in addition to and not in place of such additional remedies as a Court may order, including equitable relief to prevent further breaches or to provide further remedies.

(d) This provision shall not affect the damages or other remedies the Company may recover from any other provisions of this Agreement.

*Id.* § 7(c)–(d).

## **Grant Agreement**

86.    In connection with his employment, McDonough executed a Grant Agreement. *See* Ex. E.

87.    In addition to his obligations under the Confidentiality Agreement and Non-Solicitation Agreement, McDonough again agreed through his Grant Agreement to be bound by additional confidentiality, non-solicitation, and conflict of interest provisions. *See id.* §§ 2 through 4(a)–(b), 5.

88.    Specifically, McDonough again agreed to protect Marsh's confidential information:

Restrictive Covenants: Confidentiality And Non-Disparagement

(a) The Employee agrees that he or she will not, during his or her employment with the Company, or at any time after such employment terminates, use for his or her own or another's purposes, or disclose to any other person or entity (other than in the proper course of employment with the Company) any Confidential Information.  This Section 4(a) shall not apply to any part of such Confidential Information that comes into the public domain otherwise than by reason of an unauthorized disclosure; or that is disclosed to the Employee on a non-confidential basis by a third party who is not bound by a duty of confidentiality.

*Id.* § 4(a).

89.    Under the Grant Agreement, Confidential Information includes:

(i) financial and business information relating to the Company, such as information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures and new marketing ideas;

(ii) product and technical information relating to the Company, such as product formulations, new and innovative product ideas, methods, procedures, devices, machines, equipment, data processing programs, software, software codes, computer models and research and development projects;

(iii) client information, such as the identity of the Company's clients, the names of representatives of the Company's clients responsible for entering into contracts with the Company, the amounts paid by such clients to the Company, specific client needs and requirements, specific client risk characteristics, policy expiration dates, policy terms and conditions, information regarding the markets or sources with which insurance is placed and leads and referrals to prospective clients;

(iv) personnel information, such as the identity and number of the Company's other employees and officers, their salaries, bonuses, benefits, skills, qualifications and abilities;

(v) any and all information in whatever form relating to any client or prospective client of the Company, including but not limited to its business, employees, operations, systems, assets, liabilities, finances, products, and marketing, selling and operating practices;

(vi) any information not included in (i) or (ii) above which the Employee knows or should know is subject to a restriction on disclosure or which the Employee knows or should know is considered by the Company's clients or prospective clients to be confidential, sensitive, proprietary or a trade secret or is not readily available to the public; or

(vii) intellectual property, including inventions and copyrightable works.

*Id.*

90.     Further, McDonough's Grant Agreement states that "Confidential Information is not generally known or available to the general public, but had been developed, compiled or acquired by the Company at its effort and expense." *Id.* Confidential information can be in any form, including but not limited to: verbal, written or machine readable, including electronic files. *Id.*

91.     McDonough also agreed to be bound by a provision requiring the return of Marsh property upon the termination of his employment:

Immediately upon the termination of employment with the Company for any reason, or at any time the Company so requests, the Employee will return or provide to the Company:

(i) any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports, lists of the Company's clients or leads or referrals to prospective clients, and other media or property in the Employee's possession or control which contain or pertain to Confidential Information or trade secrets;

(ii) all property of the Company, including, but not limited to, supplies, keys, access devices, cellphones, laptops, iPhones, iPads, books, identification cards, computers, telephones and other equipment;

(iii) all passwords, passcodes, security PINs, biometrics, and/or any other information or means necessary for the Company to access property of the Company stored on any device or equipment in writing.

The Employee further agrees not to take any action (such as wiping or deleting) at any time with respect to any electronic devices that would hinder the access of information by the Company.  The Employee agrees that upon completion of the obligations set forth in this subparagraph, and if requested by the Company, the Employee will execute a statement declaring that he or she has retained no property of the Company or materials containing Confidential Information, nor has he or she supplied the same to any person, except as required to carry out his or her duties as an employee of the Company.  A receipt signed by an Officer of the Employer itemizing the returned property is necessary to demonstrate that Employee has returned all such property to the Company.

*Id.* § 4(b).

92.    In the Grant Agreement, McDonough also agreed to additional terms related to confidentiality and non-disparagement:

Restrictive Covenants: Confidentiality And Non-Disparagement

--

(c) The Employee acknowledges and agrees that Employee is not authorized to access and use the Company's computer systems and protected computers, including laptop computers and Company devices, and the data contained therein, for personal gain or to benefit third parties (other than in the course of the Employee's performance of services for the Company or as expressly and specifically authorized by the Company) and that any such access or use is unauthorized.

(d) The Employee further agrees that, except as required by law, the Employee will not do or say (or omit to do or say) anything that is intended, or might reasonably be expected, to harm or disparage the Company or to impair its reputation, or the reputation of any of its services, products, officers or employees. This provision is not intended to abridge any obligations or rights otherwise provided by law.

*See id.* § 4(c)–(d).

93.    Furthermore, in his Grant Agreement, McDonough agreed to be bound by a client

non-solicitation provision:

<u>Restrictive Covenants: Clients</u>

(a) The Employee acknowledges and agrees that solely by reason of employment by the Company, the Employee has and will come into contact with and develop and maintain relationships with a significant number of the Company's clients and prospective clients and have access to Confidential Information (as defined below) and trade secrets relating thereto, including those regarding the Company's clients, prospective clients and related information, and will have access to and the benefit of goodwill developed by the Company with its clients.

(b) Consequently, the Employee covenants and agrees that in the event of separation from employment with the Company, whether such separation is voluntary or involuntary, the Employee will not, for a period of twelve (12) months following such separation, directly or through others:

> (i) solicit clients of the Company for the purpose of selling or providing products or services of the type sold or provided by the Employee while employed by the Company; or
>
> (ii) induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company; or
>
> (iii) perform or supervise the performance of services or provision of products of the type sold or provided by the Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company; or
>
> (iv) assist others to do the acts specified in Paragraphs 2(b) (i)-(iii).

This restriction shall apply only to those clients or prospective clients of the Company with which the Employee had contact or about which the Employee obtained Confidential Information or trade secrets during the last two (2) years of his or her employment with the Company or its predecessors. For the purposes of Section 2, the term "contact" means interaction between the Employee and the client which takes place to further the business relationship or making (or assisting or supervising the making of) sales to or performing or providing (or assisting or supervising the performance or provision of) services or products for the client on behalf of the Company. For purposes of Section 2, the term "contact" with respect to a "prospective" client means interaction between the Employee and a potential client of the Company which takes place to obtain the business of the potential client on behalf of the Company. It shall not be a defense to a claim that this

provision has been breached that Employee's new employer or entity for which Employee is performing services has previously solicited or served the client. Employee shall not engage in any subterfuge to circumvent this prohibition, including, but not limited to accompanying others on calls to the client, contacting the client with other persons, supervising other persons in soliciting or serving the client, providing Confidential Information to others to assist them in soliciting or serving the client, participating in developing presentations to be made to the client, or other similar activities.

*Id.* § 2(a)–(b).

94.    McDonough also agreed to be bound by an employee non-solicitation provision:

The Employee acknowledges and agrees that solely as a result of employment with the Company, and in light of the broad responsibilities of such employment which include working with other employees of the Company, the Employee has and will come into contact with and acquire Confidential Information and trade secrets regarding the Company's other employees. Accordingly, both during employment with the Company and for a period of twelve (12) months thereafter, the Employee shall not, either on the Employee's own account or on behalf of any person, company, corporation, or other entity, directly or through others, solicit, or endeavor to cause any employee of the Company with whom the Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom the Employee obtained Confidential Information to leave employment with the Company.

*Id.* § 3.

95.    Finally, in the Grant Agreement, McDonough agreed to be bound by a conflict of interest provision that mirrors the conflict of interest provision agreed to in his Non-Solicitation Agreement. *Id.* § 5.

**Supplemental Terms and Conditions of Employment Agreements**

96.    In addition to the agreements described above, both McDonough and Hall executed Supplemental Terms and Conditions of Employment Agreements in connection with their employment at Marsh. Exs. D; F, Supplemental Terms and Conditions of Employment.

97.    Further to their obligations under McDonough and Hall's Confidentiality Agreements and Non-Solicitation Agreements, and McDonough's Grant Agreement, McDonough and Hall agreed to abide by all applicable "compliance policies found on [Marsh's] compliance website (www.compliance.mmc.com) as updated from time to time including, but not limited to, The Marsh & McLennan Companies Code of Conduct, *The Greater Good*." *Id.* Further,

McDonough agreed to adhere to "all of the policies and procedures of the Company whether set forth in the Handbook or elsewhere." Ex. D.

98.    Specifically, per Marsh's Code of Conduct, attached hereto as **Exhibit G**, McDonough and Hall agreed, among other things, to refrain from "[d]iscussing or agreeing with competitors on inappropriate matters, including fee and commission levels, strategic plans and how we win business." Ex. G at 31.

99.    McDonough and Hall agreed to refrain from "[s]haring the Company's competitively sensitive information with a competitor," *id.*, and to "[u]se and disclose Company information only for legitimate business purposes," and "[p]rotect intellectual property and confidential Company information by sharing it only with authorized parties[.]" *Id.* at 55.

100.    And per Marsh's Handbook, attached hereto as **Exhibit H**, McDonough and Hall agreed, among other things, not to "use, reproduce or disclose to anyone for any purpose the confidential information/software" received or to which they had access. Ex. H at 92. This includes "files, data and other confidential information" which McDonough and Hall accessed through Marsh's computer-based information network. *Id.* at 91.

## IV.    The Agreements Are Enforceable and Necessary to Protect Marsh's Business Interests.

101.    The Agreements make clear that McDonough and Hall's violation of the restrictive covenants described above would result in irreparable injury to Marsh.

102.    For example, in their Non-Solicitation Agreements, McDonough and Hall "expressly acknowledge[d]" that "the restrictions and obligations" discussed above "are necessary to protect the legitimate business interests of the Company and are reasonable in view of the benefits and consideration [they] received . . . from the Company." Exs B. § 4; F, Non-Solicitation Agreement § 5. *See also* Ex. E § 6 (similar).

103.    Additionally, in their Confidentiality Agreements, McDonough and Hall agreed that "irreparable injury will result" to Marsh if they breach their obligations under the Agreement and that, in the event of such breach, Marsh shall be entitled to specific performance and temporary

and permanent injunctive relief, recovery of reasonable sums and costs, including attorneys' fees, and any other legal remedies and damages available. Exs. A § 6(c); F, Confidentiality Agreement § 6(c). *See also* Exs. B § 5; E § 7; and F, Non-Solicitation Agreement § 6 (similar).

104.    McDonough and Hall received adequate consideration in exchange for agreeing to be bound by the restrictive covenants in the Agreements.

105.    For entering into the Confidentiality Agreement and Non-Solicitation Agreement, McDonough received consideration in the form of employment by Marsh, eligibility to participate in certain bonus compensation plans, and access to Marsh's confidential information and trade secrets:

> In consideration of my (a) employment by Marsh USA Inc. and/or subsidiaries thereof (the "Employer"), the parents and affiliates of which comprise Marsh & McLennan Companies, Inc. (the "Company"), (b) participation in Employer's Incentive Compensation Plan, Sales Compensation Plan, the Variable Compensation Plan and/or any other bonus compensation plan, if required under such plan, and (c) my access to Confidential Information and Trade Secrets belonging to the Company. I hereby agree to be bound by this Confidentiality Agreement and the Non-Solicitation Agreement executed simultaneously by me . . . .

Ex. A. *See also* Ex. B (similar).

106.    For entering into the Confidentiality Agreement and Non-Solicitation Agreement, Hall received consideration in the form of employment by Marsh, eligibility to participate in certain bonus compensation plans, and access to Marsh's confidential information and trade secrets:

> In consideration of my (a) employment or continued employment by Marsh USA Inc. and/or subsidiaries thereof (the "Employer"), together with the parents and affiliates of which comprise Marsh & McLennan Companies, Inc. (the "Company"), (b) participation in Employer's Incentive Compensation Plan, Sales Compensation Plan, the Variable Compensation Plan and/or any other bonus compensation plan, if required under such plan, and (c) my access to and provision with Confidential Information and Trade Secrets belonging to the Company, I hereby agree to be bound by this Confidentiality Agreement[.]

Ex. F, Confidentiality Agreement. *See also id.*, Non-Solicitation Agreement (similar).

107.    Likewise, the Grant Agreement explicitly lists the following "Consideration Events" in exchange for McDonough's agreement to its terms:

Effectiveness Of Agreement

The Employee acknowledges and agrees that the execution of this Agreement is a condition precedent to any Consideration Event. For purposes of this Agreement, a "Consideration Event" means an occurrence of any of the following events: (i) the granting to the Employee of an Award, (ii) the Employee's exercise of a stock option or other Award, or (iii) any continuation or acceleration of the vesting of an Award following the Employee's separation from employment as provided in the applicable Terms & Conditions of such Award.

Ex. E § 1.

108.    For agreeing to be bound by the provisions of their Supplemental Terms and Conditions of Employment Agreements, McDonough and Hall received consideration in the form of employment by Marsh.    Exs. D; F, Supplemental Terms and Conditions of Employment Agreement.

109.    Additionally, McDonough and Hall agreed that "the benefits provided in [the] Offer Letter, as well as [their] continued employment, constitute sufficient consideration for [their] execution" of the Confidentiality Agreement, Non-Solicitation Agreement, and the Supplemental Terms and Conditions of Employment Agreement.  Exs. C; F.

## V.    Defendants Participated in an Illicit Scheme to Raid Marsh's Construction Surety Group.

110.    Aon directly competes with Marsh in the highly competitive insurance industry.

111.    Following Aon's loss of many of its own employees in its surety business, Defendants hatched an unlawful scheme to raid Marsh's employees and clients—attempting to appropriate wholesale Marsh's business and misappropriating Marsh's confidential information and trade secrets in the process.

112.    Aon could not execute the plan to raid Marsh alone—it needed an inside man and enlisted McDonough, a senior leader in Marsh's Construction Surety business unit, to use his knowledge of Marsh's confidential information and his relationships with Marsh's employees and clients to advance an unlawful scheme and raid Marsh's Construction Surety business.

113.    McDonough was a natural choice for Aon to enlist in the plot to steal Marsh's customers and talent.  As described above, during his time at Marsh, McDonough developed a

deep knowledge of Marsh's Construction Surety business, including an in-depth understanding of the dynamics between key clients and employees.

114.    While devising this plan, on information and belief, Aon was aware of the contractual and fiduciary duties owed by McDonough and Hall.  And Aon was well aware of McDonough and Hall's role within Marsh's Construction Surety business and the attendant common law fiduciary duties associated with their employment.  Yet these obligations owed by McDonough and Hall to Marsh did nothing to deter Aon's plan to raid the Construction Surety group.

115.    Defendants began their efforts to target select Marsh employees—including Hall—at least as early as February 2025.  In exit interviews with Marsh personnel on March 10, 2025, two Departing Employees noted that they had not previously given any consideration to leaving Marsh until "Alpaugh" contacted them "a few weeks" before the raid was executed.[2]

116.    One of the Departing Employees specifically reported to Michael Pellegrini, Regional Head of Marsh Specialty, that the raid was "***all orchestrated*** by Rob McDonough."  This Departing Employee explained that McDonough "selected the best 20 people in the practice to leave together" and told the Departing Employee he had the choice to either "***take life changing money and stay with us or be left behind and clean up the puke***."

117.    On information and belief, McDonough worked with Aon to poach as many of what he considered to be the "best" "people in the practice" that he could lure away from Marsh.  To help tailor that effort and maximize its success, on information and belief, McDonough shared confidential employment and compensation information about the targeted Marsh employees.  As one of the Departing Employees explained in an exit interview with Marsh personnel on March

---

[2] "Alpaugh" refers to, on information and belief, Jeffrey Alpaugh, President of Aon's North America operations. Aon's awareness—and raid—of Marsh talent is unsurprising, given that Alpaugh himself is a former Marsh employee. Specifically, Alpaugh served most recently as Marsh's National Industry Leader until October 2023, before leaving for Aon.  *See* Gavin Souter, BUSINESS INSURANCE, "Aon hires Alpaugh from Marsh as North America leader" (Oct. 31, 2023), available at https://www.businessinsurance.com/aon-hires-jeff-alpaugh-from-marsh-as-north-america-leader/.  During his tenure at Marsh, Alpaugh worked directly with McDonough and other Departing Employees.

10, 2025, he "couldn't pass up the offer to take care of himself and his team"—an offer crafted by Aon, with the assistance of McDonough.

118.    As part of this collusion, on information and belief, McDonough identified targets for Aon and worked with Aon, at its direction and for its benefit, to orchestrate communications to Hall and the other Departing Employees for the purpose of recruiting them to Aon.  In facilitating Aon's targeting of recruits and designing of offers to entice the Departing Employees to leave, McDonough drew upon his knowledge of Marsh's confidential information, including personnel data related to compensation and client contacts.

119.    McDonough certainly had the knowledge and toolkit to help Aon determine which Departing Employees and clients to solicit.  For instance, in an email to Marsh human resources personnel, McDonough argued that one of the Departing Employees, Noonan, should receive a retention bonus award, including multiple paragraphs about his experience at Marsh, his relative strengths, and the importance of his client relationships.  About Noonan, McDonough remarked, "[He] has been an incredibly valuable contributor to Marsh . . . [h]e handles some of our largest and most important surety and insurance accounts . . . and a move would definitely put us at considerable risk around many of these accounts[.]"  Ironically, McDonough foreshadowed, "I also FULLY expect that *Aon* will approach [Noonan] as he left there with a very strong reputation that has only strengthened during his time at Marsh."  Driving home the critical role played by these employees, McDonough stated that both Noonan and Casey, another Departing Employee whom McDonough argued should receive a retention bonus from Marsh, were "***the future of our [team]***."

120.    A little more than a month after being intimately involved in compensation decisions for these Departing Employees that took into account their importance to the long-term success of Marsh's business, McDonough helped Aon solicit them away from Marsh.

121.    McDonough's last day of employment at Marsh was March 14, 2025.  On or about March 17, 2025, McDonough assumed a comparable role at Aon, as CEO of its North American Construction, Infrastructure, and Surety group.  On information and belief, the 19 other Departing

Employees also assumed similar roles at Aon—essentially mirroring the structure and roles of Marsh's Construction Surety business.

122.    In the wake of the mass resignation, Marsh moved swiftly to investigate the facts surrounding the Departing Employees' departures.  Marsh personnel spoke with many of the Departing Employees after they resigned.

123.    In these interviews, multiple Departing Employees gave similar answers that were evasive or that appear to have been untrue.  For example, several Departing Employees referenced wanting to move or leave with the "team," but did not—or would not—specify who exactly the "team" included.  And, during a call on March 11, 2025, one Departing Employee expressed she would only come back to Marsh if the entire "team" was going back, while at the same time claiming she did not know who else from the "team" had left.

124.    These interviews further confirmed McDonough and Aon's plot to steal Marsh employees as a group.  In particular, one Departing Employee stated on March 11, 2025 that McDonough "trusts" him, that he "***made commitments to***" McDonough, and that he did not want to be the one to "split the team" by remaining at Marsh.

125.    Microsoft Teams messages sent between Departing Employees and other Marsh personnel on and around the day of the raid also shed light on McDonough and the Departing Employees' intentions to leave as a group—and to take clients or other employees with them.

126.    On March 10, 2025 for example, one Departing Employee received a message stating, "you are all going together?"  The Departing Employee replied, "?," to which the Marsh employee responded, "don[']t play dumb with me."  In a separate thread between the same two individuals from March 11, 2025, the Departing Employee communicated that he could not be convinced to stay at Marsh because he was "committed" and couldn't "go back on [his] word."

127.    In fact, it was widely recognized that this was a coordinated, group raid by Aon of Marsh's Construction Surety business unit.  On March 11, 2025, when a Departing Employee was asked by a Marsh employee whether he was "moving to Aon," the Departing Employee responded,

"I am…***want to come***?"  The Marsh employee, understanding that this corporate raid involved a coordinated effort, replied, "Ha!  I wasn't ***invited to the party***."

128.    Even after their resignation, the Departing Employees, including McDonough and Hall, continued their efforts to solicit Marsh employees.  Recently, Departing Employees repeatedly called and texted a junior Marsh associate, explaining they were in town and pestering the associate to come out, stating, "[Hodges] wants to see you."  After the associate refused to join the group of Departing Employees that night, one of the Departing Employees—who had called the associate twice and texted him ***fourteen times*** that night—pressured the associate to join the Departing Employees for coffee the next morning.

129.    Despite the widespread recognition of what was going on—or perhaps *because of it*—many of the Departing Employees attempted to cover their tracks.  Several of them failed to comply with their obligations to promptly return Marsh-issued devices upon their departure.  Other Departing Employees returned devices with encryption and heightened security features activated that impeded Marsh's ability to review the devices.

130.    And at least three Departing Employees ***wiped the contents of their mobile devices entirely before returning them***.  One of those employees even admitted to intentionally deleting certain information from his mobile device.

131.    Two other Departing Employees insist that they are simply unable to recall their device passcodes, effectively locking Marsh out of the company-issued devices.

132.    Marsh has repeatedly asked counsel representing the Departing Employees to preserve and produce electronic backups of the five wiped or locked Marsh-issued devices, but as of the date of filing this Amended Complaint, no such electronic records have been produced.

## VI.    Defendants Worked Together to Unlawfully Induce, and Attempt to Induce, Marsh's Clients to Move to Aon.

133.    McDonough and Hall's work at Aon's direction—while still on Marsh's payroll—was not limited to raiding Marsh ***employees*** for Aon.  Both prior to and following their departure from Marsh, on information and belief, McDonough and Hall solicited, attempted to solicit, or

directed others to solicit, Marsh clients to terminate their business relationships with Marsh and to move their business to Aon.

134.    Further, on information and belief, McDonough and Hall also worked with Aon to develop a carefully orchestrated plan to identify Marsh clients—particularly ones with which McDonough and Hall had strong relationships—to move their business to Aon.  Identifying and approaching these clients necessarily drew upon Marsh's confidential information and trade secrets, including information about the clients' current contracts with Marsh, Marsh's pricing, Marsh's business development strategies, and client preferences

135.    For example, on March 11, 2025, *just one day after* the Departing Employees resigned *en masse*, a Marsh client submitted a Broker of Record ("BOR") letter moving its business to Aon.  Notably, on this same day, this client replied to an email sent by Aon's President on March 10, 2025, *the day that McDonough resigned from Aon*, with an executed authorization letter for Aon's Construction and Surety Practice.  In this correspondence, the client copied McDonough's Marsh email, demonstrating that McDonough had been involved in soliciting this client even before his departure.  The client was one with which McDonough was heavily involved while employed at Marsh, and about which McDonough possessed confidential information and trade secrets.  Similarly, a day later, an underwriter corresponded with Marsh's Senior Vice President in Construction Surety, confirming he was "in receipt" of a BOR letter from a separate client, directing them to recognize ***Aon*** as the new agent of record.

136.    Further, another client for which McDonough served as a business lead while at Marsh similarly notified the company on March 11, 2025 that it would be terminating its agreement with Marsh and wanted "immediate revocation of all broker-of-record letters previously provided to Marsh."  On information and belief, this client intends to move its business from Marsh to Aon.

137.    On March 12, 2025, a contact at a different Marsh client (with whom McDonough closely worked) informed a Marsh executive that Aon is "***all over*** [the client]," presumably in an attempt to solicit the client's business.  In the *week prior* to the raid, on March 7, 2025, McDonough attended a meeting with two Marsh marketing executives to discuss how Marsh could support this

same client in connection with a significant potential business opportunity. On information and belief, McDonough is soliciting—or is directing or assisting others to solicit—this Marsh client's business opportunity for the benefit of Aon in violation of his non-solicitation restrictions at Aon's direction and for its benefit.

138.    Shortly before resigning, one of the Departing Employees negotiated terms of several bonds with Marsh clients, with specific instructions to the fulfillment representative not to enter the bonds into MSurety, Marsh's digital surety tracking platform, or to bill for them without additional approval.

139.    The Departing Employee's instructions deviated from Marsh's standard practice, which typically sees bonds processed in MSurety and/or invoiced once signed. On information and belief, this deviation provided the Departing Employee with enough delay to "hold" the business opportunity so that the agreed upon bonds could ultimately be issued by *Aon*.

140.    McDonough and the Departing Employees' efforts to solicit Marsh's clients on behalf of Aon continues to this day. As just one example, a senior Marsh employee learned that one Departing Employee reached out to an existing Marsh client to inform them of his move to Aon and to say that *he would like to continue working with them*." Other clients have continued to send BOR notices to Marsh and to otherwise inform Marsh of their intent to move their business, including by appointing Aon as their Broker of Record.

141.    Recently, Marsh learned that McDonough, on behalf of Aon, intended to participate on a call involving a Marsh client. Specifically, McDonough was apparently leading a conversation on behalf of Aon with the client about a significant transportation facility construction project ("Project A"). These discussions on behalf of Aon certainly implicated the same request for proposals regarding Project A that, prior to his departure, McDonough was involved in responding to on behalf of Marsh. In helping to develop Marsh's proposal for Project A, McDonough was necessarily privy to confidential information related to this tender.

142.    And McDonough was keenly aware of how valuable this particular client is to Marsh. Just weeks before he defected, McDonough messaged another Marsh employee

emphasizing the need to impress this specific client because they brought millions of dollars' worth of business to Marsh.

143.    McDonough's leadership of the call on behalf of Aon inevitably drew upon Marsh's confidential information for the business advantage of Aon.

144.    Even more recently, and, importantly, *after* the Departing Employees received written reminders of their continued obligations to Marsh, McDonough and Adler attended an industry conference in San Deigo, California.  During the conference, McDonough and Adler actively and repeatedly targeted Marsh employees and clients, with whom they worked while employed by Marsh, in what could only be an effort to solicit them on behalf of Aon.

145.    The Departing Employees and Aon also interfered with potential clients.  For example, after months of client engagement, Marsh was announced as a finalist to operate as broker on a significant infrastructure construction project ("Project B").  If Marsh secured Project B, Marsh would have earned millions of dollars in potential revenue over the course of the construction project's life cycle.  Several of the Departing Employees served as the key faces to the client on Marsh's bid for Project B, and their resignation came just as the proposal process was approaching the finish line.  Soon after the Departing Employees resigned, in early April 2025, Marsh learned that it lost the bid on Project B to a subsidiary of Aon.  The timing of Aon's raid directly impacted Marsh's chances to win this opportunity and, on information and belief, Aon worked with its subsidiary to unfairly frustrate Marsh's efforts to secure Project B misappropriating Marsh's confidential information, provided to Aon by the Departing Employees, in violation of their obligations to Marsh.

146.    The Departing Employees also successfully solicited existing Marsh clients.

147.    For example, in the weeks leading up to his resignation, Hall used his company-issued laptop to access confidential information and trade secrets related to a specific Marsh client ("Client M"), including financial and payment data, as well as client-specific information and preferences that are not accessible to the public.  Hall was the business lead for Client M while he was employed by Marsh.

148.    Hall was duty-bound to protect Marsh's confidential information and trade secrets, to which he had access due only to his employment with Marsh, and not to appropriate the information for his own use.

149.    Nevertheless, on information and belief, Hall deliberately exploited this information by using it to divert Client M's business—in which Marsh had a tangible interest—away from Marsh and to a competitor, in violation of his contractual and common law obligations to Marsh.

150.    Not surprising, shortly after Hall and the other Departing Employees left Marsh, on May 2, 2025, Client M sent notice to Marsh stating that it would be terminating the parties' agreement and moving all of its surety business from Marsh to Aon.

151.    The sensitive information related to Client M that Hall accessed in the days just preceding his resignation included:

> a.    Client M's Bond Collateral Summary ("Collateral Summary"), which is a compilation of Client M's financial data supporting repayment of the surety, provided to Marsh for use in servicing Client M's account.  The Collateral Summary includes bank names, bank accounts, affiliated assets, and statement balances;

> b.    Client M's Client Services Agreement ("CSA") and Marsh's response to Client M's request for proposal, which reflect client-specific information and preferences identified and developed by Marsh and not readily ascertainable by the public.  The CSA also contains compensation information, competitive pricing, and terms and conditions of Client M's contracts.

152.    The solicitation of Client M was made possible by Hall's improper access and usurpation of Marsh's confidential information and trade secrets, in violation of Hall's duties to serve the ends of his fiduciary relationship with Marsh.

153.    In explaining the decision to part ways with Marsh, Client M referenced concerns regarding sufficient staffing and expertise remaining at Marsh.  Of course, Defendants had to

recognize that a mass resignation by McDonough, Hall, and the Departing Employees, closely coordinated with Aon, would produce precisely such market concerns.  And, apparently, Defendants' coordinated ambush tactics had the intended effect, resulting in harm to Marsh's business through loss of revenue and goodwill.

154.    The obvious timing of these and other client moves—including those occurring when news of the resignations had barely begun to circulate in the broader market and those pointing to suggested staff shortages—strongly suggest they were spurred by improper direct and indirect solicitation of the clients by McDonough, Hall, and other Departing Employees with the aid and encouragement of McDonough, Hall, and Aon.

155.    As a result of the raid, a significant number of Marsh's Construction Surety group members moved to Aon and numerous Marsh clients—which collectively represent millions of dollars in revenue annually—announced their departure from Marsh, diminishing Marsh's significant investments in building relationships with its clients and immeasurably harming Marsh's reputation and goodwill in the brokerage industry.

## VII.    McDonough's Violations of His Duties to Marsh Included Misusing Confidential Information Beyond Just Customer Information for the Benefit of Aon and at the Expense of Marsh.

156.    In the days leading up to and following the raid, McDonough did not limit his unlawful activities to directing clients and employees away from Marsh—he also learned highly confidential information and trade secrets related to Marsh's plan to recruit a candidate, and, on information and belief, deliberately misappropriated this information by disclosing it to Aon, in violation of his contractual and common law obligations to Marsh.

157.    A week before the mass resignation, McDonough was made aware of ongoing efforts by Marsh to recruit a candidate then employed by Aon.  On March 4, 2025, McDonough received a calendar invite for the following Friday, March 13, 2025, to meet with the candidate. In connection with preparing for this interview, Marsh personnel shared with McDonough detailed information about the candidate's experience and confidential information related to Marsh's strategy to recruit him.

158.    This confidential information shared by Marsh with McDonough in advance of the interview included specific topics for McDonough to discuss with the candidate, focused on the structure and organization of the business—specifically, the Construction Surety business—as well as the timing and nature of subsequent interviews and discussion of a potential offer.

159.    After receiving this confidential information, McDonough responded: "Ok **great intel** and recap I will be ready for the call.  Sounds like a great candidate 👍" (emphasis added).

160.    The candidate's scheduled interview with McDonough did not take place due to McDonough's departure three days before the interview date.  But Marsh subsequently learned that McDonough relayed to Aon leadership that the candidate was engaging in serious discussions with Marsh regarding an employment opportunity.

161.    On information and belief, McDonough disclosed and misused the confidential information he learned in connection with Marsh's recruitment of the candidate in order to interfere with Marsh's recruitment efforts and to benefit Aon in clear violation of his confidentiality restrictions and the duty of loyalty McDonough owed to Marsh.

### COUNT I
### Breach of Contract
*(As Against McDonough and Hall)*

162.    Marsh repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

163.    Marsh has valid and enforceable Confidentiality Agreements with McDonough and Hall.

164.    Marsh has valid and enforceable Non-Solicitation Agreements with McDonough and Hall.

165.    Marsh has a valid and enforceable Grant Agreement with McDonough.

166.    Marsh has valid and enforceable Supplemental Terms and Conditions of Employment Agreements with McDonough and Hall.

167.    Marsh performed its obligations under the Confidentiality Agreements.

168.    Marsh performed its obligations under the Non-Solicitation Agreements.

169.    Marsh performed its obligations under the Grant Agreement.

170.    Marsh performed its obligations under the Supplemental Terms and Conditions of Employment Agreements.

171.    McDonough breached his Confidentiality Agreement by, for example, directly or indirectly using, disseminating, and/or disclosing Marsh's confidential and proprietary information for purposes not required to carry out his duties as an employee of Marsh.

172.    Hall breached his Confidentiality Agreement by, for example, directly or indirectly using, disseminating, and/or disclosing Marsh's confidential and proprietary information, including trade secrets, for purposes not required to carry out his duties as an employee of Marsh.

173.    McDonough breached his Non-Solicitation Agreement by, for example directly or indirectly: (A) during the 12-month restricted period (i) soliciting Marsh clients or prospective client for the purpose of selling or providing products or services of the type sold or provided by McDonough while employed by Marsh, (ii) inducing Marsh clients or prospective clients to terminate, cancel, not renew or not place business with Marsh, (iii) performing or supervising the provision or performance of services or provision of products of the type sold or provided by McDonough while he was employed by Marsh on behalf of any Marsh clients or prospective clients, and (iv) assisting others to do the acts specified in (i) through (iii) of this paragraph; (B) both during employment with the Company and during the 12-month restricted period, directly or indirectly, soliciting or endeavoring to cause Marsh employee(s) to leave employment with Marsh; and (C) using his position, influence, and knowledge of Confidential Information and Trade Secrets or the Company's assets for personal gain.

174.    Hall breached his Non-Solicitation Agreement by, for example, directly or indirectly: (A) during the 12-month restricted period (i) soliciting Marsh clients or prospective client for the purpose of selling or providing products or services of the type sold or provided by McDonough while employed by Marsh, (ii) inducing Marsh clients or prospective clients to terminate, cancel, not renew or not place business with Marsh, (iii) performing or supervising the provision or performance of services or provision of products of the type sold or provided by Hall while he was employed by Marsh on behalf of any Marsh clients or prospective clients, and (iv)

assisting others to do the acts specified in (i) through (iii) of this paragraph; and (B) using his position, influence, knowledge of Confidential Information and Trade Secrets or the Company's assets for personal gain.

175.    McDonough breached his Grant Agreement by, for example, (A) soliciting Marsh clients for the purpose of selling or providing products or services of the type sold or provided by McDonough while employed by Marsh during the 12-month restricted period; (B) both during employment with the Company and during the 12-month restricted period, directly or indirectly, soliciting Marsh employee(s) to leave employment with Marsh; (C) disclosing Marsh's Confidential Information during and/or after his employment with Marsh; (D) failing to return or provide Marsh with (i) all documents that contain or pertain to Marsh's Confidential Information or Trade Secrets, (ii) all Marsh property, and/or (iii) all passwords, passcodes, security PINS, biometrics, and or/any other information or means necessary for Marsh to access its property stored on any device or equipment in writing; (E) disparaging Marsh; and (F) using his position, influence, knowledge of Confidential Information or Trade Secrets or the Company's assets for personal gain.

176.    McDonough breached his Supplemental Terms and Conditions of Employment Agreement by, for example, failing to abide by Marsh's Code of Conduct.  McDonough discussed inappropriate matters with a competitor, including fee and commission levels, strategic plans, and how Marsh wins business.  McDonough also shared Marsh's competitively sensitive information with a competitor, used and disclosed Marsh information for illegitimate purposes, and failed to protect intellectual property and confidential information by sharing it with unauthorized parties.

177.    Hall breached his Supplemental Terms and Conditions of Employment Agreement by, for example, failing to abide by Marsh's Code of Conduct.  Hall utilized Marsh's confidential information and trade secrets,  including fee and commission levels, strategic plans, and how Marsh wins business, for the benefit of a competitor.  Hall also used and disclosed Marsh information for illegitimate purposes and failed to protect Marsh's intellectual property and confidential information by sharing it with unauthorized parties.

178.    McDonough and Hall's breaches have and continue to directly and proximately cause harm to Marsh.

179.    As a direct and proximate result of McDonough and Hall's breaches, Marsh is entitled to the express remedies provided for in the parties' agreements, in addition to all available legal and equitable remedies.

180.    Marsh is also being irreparably harmed by McDonough and Hall's breaches of the agreements and is therefore entitled to preliminary and permanent injunctive relief.

**COUNT II**
**Breach of Fiduciary Duty**
*(As Against McDonough and Hall)*

181.    Marsh repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

182.    McDonough and Hall occupied positions of trust at Marsh.  By virtue of their employment and privileged access to Marsh trade secrets and other confidential and proprietary information, McDonough and Hall owed fiduciary duties to Marsh, as their employer, including, *inter alia*, duties of loyalty, absolute candor, good faith, and to avoid self-dealing and conflicts of interest.

183.    McDonough and Hall's fiduciary duties included, among other things, maintaining the confidentiality of Marsh's confidential information, acting in good faith while carrying out their responsibilities, and acting primarily for the benefit of Marsh in matters connected with their employment.

184.    While employed by Marsh, to the extent there was no overlapping contractual obligation, McDonough and Hall owed a fiduciary duty to Marsh to not solicit Marsh's clients away from Marsh or misappropriate Marsh's business opportunities for the benefit of themselves or competitors.

185.    McDonough—while still employed by Marsh—breached his fiduciary duties to Marsh by, for example, soliciting Marsh clients to leave Marsh and to move their business to Aon.

186.    In addition, to the extent there was no overlapping contractual obligation, McDonough, while employed by Marsh, owed a fiduciary duty to Marsh to not solicit Marsh's employees away from Marsh for the benefit of himself or competitors.

187.    McDonough—while still employed by Marsh—breached his fiduciary duties to Marsh by soliciting Marsh's employees to leave employment with Marsh and accept employment with Aon.

188.    Further, while Marsh employees, to the extent there was no overlapping contractual obligation, McDonough and Hall owed a fiduciary duty to Marsh to maintain the confidentiality of Marsh's confidential information and to not misuse or disclose the information for the benefit of themselves or competitors.

189.    McDonough—while still employed by Marsh—breached his fiduciary duties to Marsh by disclosing Marsh's confidential information to Aon.

190.    Hall—while still employed by Marsh—breached his fiduciary duties to Marsh by improperly appropriating Marsh's confidential information and trade secrets—made available to him as a fiduciary and only because of his employment—for the benefit of himself or competitors. McDonough and Hall's breaches proximately caused injury—including actual damages—to Marsh, including but not limited to loss of employees in whom Marsh invested considerable resources to train and develop, irreparable harm to client relationships and client retention, and damages for lost revenue, lost business and impaired client relationships.

191.    As a direct and proximate result of McDonough and Hall's breaches of fiduciary duties, Marsh has suffered damages, including the loss of employees in whom Marsh had invested considerable resources to train and develop, lost revenue, lost business opportunities, loss of goodwill, and harm to customer relationships and customer prospects.  Moreover, McDonough and Hall's misconduct was willful, wanton, and outrageous, and therefore entitles Marsh to punitive damages.

## COUNT III
## Unfair Competition
*(As Against Aon, McDonough, and Hall)*

192.    Marsh repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

193.    McDonough acted in bad faith and engaged in unfair competition against Marsh by, among other things, willfully breaching his contractual obligations to maintain Marsh's confidential and proprietary information, breaching his contractual obligations not to solicit Marsh clients and employees, and by breaching his fiduciary duties to Marsh.

194.    Hall acted in bad faith and engaged in unfair competition against Marsh by, among other things, willfully breaching his contractual obligations to maintain Marsh's confidential and proprietary information and breaching his contractual obligations not to solicit Marsh clients.

195.    Aon acted in bad faith and engaged in unfair competition against Marsh by using Marsh's confidential information to solicit customers, by aiding and abetting McDonough's breach of the fiduciary duties he owed to Marsh, and by conspiring to compete unlawfully against Marsh by interfering with its business relationships and contracts.

196.    McDonough, Hall, and Aon undertook the foregoing acts in order to gain an unfair competitive advantage themselves, over Marsh.

197.    By their wrongful actions, Defendants knowingly and deliberately misappropriated Marsh confidential information for use in Aon's business and engaged in unfair competition with Marsh.

198.    As a direct and proximate result of the Defendants' unfair competition, Marsh has been and continues to be injured in its business and property, including, but not limited to, damages from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to customer relationships and prospects.

199.    Marsh is also being irreparably harmed by the Defendants' unfair competition and is therefore entitled to preliminary and permanent injunctive relief.

### COUNT IV
### Breach of Faithless Servant Doctrine
*(As Against McDonough and Hall)*

200.    Marsh repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

201.    By virtue of their employment and privileged access to Marsh trade secrets and other confidential and proprietary information, McDonough and Hall owed common law duties of loyalty, absolute candor, and good faith to Marsh.

202.    McDonough and Hall's duty of loyalty included, among other things, maintaining the confidentiality of Marsh's confidential information, acting in good faith while carrying out their responsibilities, and acting primarily for the benefit of Marsh in matters connected with their employment.

203.    While employed by Marsh, and to the extent there was no overlapping contractual obligation, McDonough and Hall owed a duty to Marsh to not solicit Marsh's clients away from Marsh or misappropriate Marsh's business opportunities for the benefit of themselves or competitors.

204.    McDonough—while still employed by Marsh—breached his duty of loyalty to Marsh by soliciting clients to leave Marsh and to move their business to Aon.

205.    Hall—while still employed by Marsh—breached his duty of loyalty to Marsh by pilfering Marsh's confidential information and trade secrets, obtained in the course of his employment, in order to divert Marsh business to Aon.

206.    Further, to the extent there was no overlapping contractual obligation, McDonough, while employed by Marsh, owed a duty to Marsh to not solicit Marsh's employees away from Marsh for the benefit of himself or competitors.

207.    McDonough—while still employed by Marsh—breached this duty of loyalty to Marsh by soliciting Marsh's employees to leave employment with March and accept employment with Aon.

208.    McDonough and Hall's breaches of the duty of loyalty were not  single, isolated acts, but were repeated throughout this period of time in which they contemplated and ultimately

decided to end their employment at Marsh and to commence employment at a competitor. As a result, McDonough and Hall were faithless servants toward Marsh.

209. McDonough and Hall's conduct exhibits dishonesty and disloyalty to Marsh related to their employment at Marsh. As highly regarded employees in leadership positions, Marsh entrusted McDonough and Hall with its relationships with its employees and clients, and McDonough and Hall owed Marsh a duty to safeguard those relationships from competitors.

210. McDonough and Hall received compensation, payment, distributions, and/or remuneration for their services to Marsh. As a result of McDonough and Hall's disloyal and faithless service, McDonough and Hall forfeited their right to any compensation received or to be received from Marsh, from the earliest date of their disloyalty. McDonough and Hall must disgorge ill-gotten gains and forfeit all compensation, payments, distributions, commissions, or other remuneration received from Marsh subsequent to the first disloyal act taken by McDonough and Hall, respectively. Moreover, McDonough and Hall's misconduct was willful, wanton, and outrageous, and therefore entitles Marsh to punitive damages.

### COUNT V
### Tortious Interference with Business Relationships
*(As Against Aon, McDonough, and Hall)*

211. Marsh repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

212. McDonough, Hall, and Aon possess detailed knowledge concerning the business relationships that exist between Marsh and its clients and potential clients.

213. McDonough, Hall, and Aon, directly or indirectly, intentionally and with malice, and without privilege or justification, interfered with Marsh's existing and prospective business relationships, causing existing and prospective clients to leave Marsh using unfair or improper means and/or with the intent to interfere with such relationships.

214. By their wrongful actions, McDonough, Hall, and Aon have knowingly misappropriated Marsh's confidential information and trade secrets for use in Aon's business and have engaged in unfair competition with Marsh.

215.    As a direct and proximate result of the loss of existing and prospective business relationships, Marsh has suffered damages, including, but not limited to, damages from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to client relationships and client prospects.  Moreover, McDonough, Hall, and Aon's misconduct was willful, wanton, and outrageous, and therefore entitles Marsh to punitive damages.

216.    Marsh is also being irreparably harmed by Defendants' tortious interference and is therefore entitled to preliminary and permanent injunctive relief.

### COUNT VI
### Tortious Interference with Contract
*(As Against Aon and McDonough)*

217.    Marsh repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

218.    Marsh had valid and enforceable agreement with the Departing Employees.

219.    Marsh performed its obligations under the agreements with the Departing Employees.

220.    Aon and McDonough were aware of the employment relationship that the Departing Employees had with Marsh, as well as the Departing Employees' contractual obligations to Marsh, including for example, to refrain from soliciting Marsh clients after the termination of their employment, to refrain from soliciting Marsh employees during and after the termination of their employment, and to refrain from using or disclosing Marsh's confidential information for the benefit of any third party.

221.    Aon and McDonough, improperly and without privilege, interfered in Marsh's contracts with the Departing Employees by inducing, enticing, and directing them to breach their contractual obligations to Marsh, including, without limitation, by encouraging and assisting them in the solicitation of Marsh's clients to move their business to Aon, the solicitation of Marsh employees to join Aon, and the misappropriation of Marsh's confidential information.

222.    As alleged above, McDonough, at Aon's inducement and direction, violated his Non-Solicitation Agreement and Grant Agreement by, without limitation, violating his client non-

solicit covenants by soliciting Marsh clients to move their business from Marsh to Aon.  Aon was aware of McDonough's contractual obligations but directed him to violate them for Aon's benefit.

223.    As alleged above, McDonough, at Aon's inducement and direction, violated his Non-Solicitation Agreement and Grant Agreement by, without limitation, violating his employee non-solicit covenants by soliciting Marsh employees to join Aon.  Aon was aware of McDonough's contractual obligations but directed him to violate them for Aon's benefit.

224.    As alleged above, McDonough, at Aon's inducement and direction, violated his Confidentiality Agreement and Grant Agreement by, without limitation, violating his confidentiality covenant by using and disclosing Marsh's confidential information for Aon's benefit.  Aon was aware of McDonough's contractual obligations but directed him to violate them for Aon's benefit.

225.    The Departing Employees, at Aon's and McDonough's inducement and direction, violated the non-solicitation and/or non-disclosure covenants contained in their employment agreements with Marsh by soliciting Marsh clients to move their business from Marsh to Aon, by soliciting Marsh employees to join Aon, and/or by disclosing Marsh's confidential information for Aon's benefit.  Despite being aware of the Departing Employees' contractual obligations, Aon and McDonough directed the Departing Employees to violate their obligations for Aon's benefit.

226.    The foregoing conduct was willful and intentional and has already caused and will continue to cause damage to Marsh with respect to its relationships with its clients.

227.    As a direct and proximate result of Aon's and McDonough's wrongful conduct, Marsh has suffered and will continue to suffer extensive injury and harm to its business.

228.    As a direct and proximate result of Aon's and McDonough's wrongful conduct, Marsh has suffered damages, including, but not limited to, damages from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to client relationships and client prospects.  Moreover, Aon's and McDonough's misconduct was willful, wanton, and outrageous, and therefore entitles Marsh to punitive damages.

229.    Marsh is also being irreparably harmed by Aon's and McDonough's tortious interference with the Departing Employees' contractual obligations and is therefore entitled to preliminary and permanent injunctive relief.

### COUNT VII
### Aiding and Abetting Breach of Fiduciary Duty
*(As Against Aon)*

230.    Marsh repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

231.    As detailed above, McDonough and Hall owed a fiduciary duty of loyalty to Marsh during their employment with Marsh.

232.    McDonough and Hall's fiduciary duty of loyalty prohibited them from, among other things, competing with Marsh by soliciting Marsh clients and employees away to do business with a competitor, and accessing, misusing, and/or disclosing Marsh's confidential information for the benefit of themselves or third parties without Marsh's consent.

233.    McDonough violated his fiduciary duty of loyalty by soliciting Marsh's clients away from Marsh to do business with Aon while McDonough was still employed by Marsh.

234.    McDonough violated his fiduciary duty of loyalty by soliciting Marsh's employees to join Aon while McDonough was still employed by Marsh.

235.    McDonough violated his fiduciary duty of loyalty by misusing and/or disclosing Marsh's confidential information to Aon while McDonough was still employed by Marsh.

236.    Hall violated his fiduciary duty of loyalty by accessing and/or misusing Marsh's confidential information for the benefit of himself or Aon while Hall was still employed by Marsh.

237.    Aon knowingly participated in McDonough and Hall's breaches of their duty of loyalty by encouraging and substantially assisting McDonough and Hall's breaches of their duty of loyalty.

238.    As a direct and proximate result of Aon's wrongful conduct, Marsh has suffered damages, including, but not limited to, damages from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to client relationships and client prospects.

239.    Marsh is also being irreparably harmed by Aon's wrongful conduct and is therefore entitled to preliminary and permanent injunctive relief.

## COUNT VIII
### Conspiracy
*(As Against Aon, McDonough, and Hall)*

240.    Marsh repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

241.    As alleged more fully above, Aon, acting in concert with McDonough and Hall, reached an agreement among themselves to unlawfully interfere with Marsh's business relationships and contracts and for McDonough and Hall to breach their contractual obligations and fiduciary duties owed to Marsh.

242.    Aon, McDonough, and Hall constitute a combination of two or more persons, and they acted in concert for the purpose of harming Marsh's business to Aon's benefit.

243.    In furtherance of their conspiracy, each of the Defendants committed overt unlawful and tortious acts, including those described here, and were otherwise willful participants in joint activity.

244.    As a direct and proximate result of Aon, McDonough, and Hall's conspiratorial conduct, Marsh has suffered damages, including, but not limited to, damages from lost revenue, lost business opportunities, loss of goodwill, harm to its reputation, and harm to client relationships and client prospects.

245.    Marsh is also being irreparably harmed by the Defendants' conspiratorial conduct and is therefore entitled to preliminary and permanent injunctive relief.

## COUNT IX
### Trade Secret Misappropriation Under the
### Defend Trade Secrets Act, 18 U.S.C. § 1836
*(As Against Aon and Hall)*

246.    Marsh repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

247.    Marsh has developed and acquired trade secrets of great value to its surety business, including but not limited to: financial and business information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures, and new marketing ideas; product and technical information relating to Marsh, such as product formulations, new and innovative product ideas, methods, procedures, devices, machines, equipment, data processing programs, software, software codes, computer models, and research and development projects; client information, such as the identity of Marsh's clients, the names of representatives of Marsh's clients responsible for entering into contracts with Marsh, the amounts paid by such clients to Marsh, specific client needs and requirements, specific client risk characteristics, policy expiration dates, policy terms and conditions, information regarding the markets or sources with which insurance is placed, and leads and referrals to prospective clients; personnel information, such as the identity and number of Marsh's other employees, their salaries, bonuses, benefits, skills, qualifications, and abilities; and information relating to clients or prospective clients of Marsh, including but not limited to, its business, employees, operations, systems, assets, liabilities, finances, products, and marketing, selling, and operating practices.

248.    Marsh's trade secrets are used in, or intended to be used in, conducting business throughout the United States.

249.    Marsh invested substantial time and resources to develop its trade secrets.

250.    Marsh's trade secrets are not generally known or available to the public.

251.    Marsh's trade secrets derives independent economic value by virtue of not being known or available to the public.

252.    Marsh takes reasonable, affirmative steps to protect its trade secrets and prevent others from acquiring or using its trade secrets by, for example, requiring those who have access to them, including Hall, to sign agreements restricting the use of Marsh's confidential information and limiting access to Marsh's systems, including employee computers, phones, and other devices, through password protection.

253.   Marsh's trade secrets provide Marsh a competitive advantage over its competitors.

254.   Marsh provided Hall with Marsh's trade secrets in confidence and for use only in connection with Hall's employment with Marsh and for the benefit of Marsh.

255.   Hall had a duty to maintain the secrecy Marsh's trade secrets or limit the use of Marsh's trade secrets for the benefit of Marsh.

256.   Hall signed multiple agreements—including his Confidentiality, Non-Solicitation, and Supplemental Terms and Conditions of Employment Agreements, *see* Exs. F, G, and I—in which he promised to keep Marsh's trade secrets confidential, to use Marsh's trade secrets only on behalf of Marsh, and to return and discontinue use of Marsh's trade secrets when his employment with Marsh ended.

257.   Hall improperly used and disclosed Marsh's trade secrets for the benefit of Aon without Marsh's consent.

258.   Aon wrongfully acquired Marsh's trade secrets without Marsh's consent.

259.   Hall and Aon misappropriated Marsh's trade secrets and improperly used Marsh's trade secrets for the benefit of Aon and at the expense of Marsh, without Marsh's consent.

260.   Hall knew or had reason to know that he was not to disclose or misuse Marsh's trade secrets.

261.   Aon knew or had reason to know that Marsh's trade secrets were acquired by improper means and that its misappropriation of Marsh's trade secrets were improper.

262.   As a direct and proximate result of Hall's unlawful conduct, Marsh has been irreparably damaged, and Hall and Aon have been unjustly enriched.  For example, Marsh has lost clients as a result of Hall and Aon's misappropriation of its trade secrets.  Hall and Aon's unjust enrichment include, for example, value attributable to the misappropriated information, amounts that Hall and Aon saved in costs and development by using the misappropriated information, increased productivity resulting from the use of the misappropriated information, and increased market share.  The exact amount of these damages and unjust enrichment is not presently

ascertainable but is believed to be in excess of several hundreds of thousands of dollars and increasing each month.

263.    The acts described above constituted willful and malicious misappropriation in that Hall, at Aon's direction, accessed Marsh's trade secrets with the deliberate intent to injure Marsh's business and improve his and Aon's own.

## JURY TRIAL DEMANDED

Marsh hereby demands a jury trial as provided by Rule 38 of the Federal Rules of Civil Procedure as to all issues or claims for which a jury trial is allowed.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Marsh respectfully requests the Court grant the following relief:

a.  Entry of judgment in Marsh's favor as specified in this Complaint;

b.  Entry of preliminary and permanent injunctive relief;

c.  Actual damages;

d.  Punitive damages;

e.  Exemplary damages;

f.  Prejudgment and post judgment interest and court costs;

g.  Attorney's fees, as expressly provided under the Agreements as well as the DTSA;

h.  Liquidated damages for McDonough and Hall's breaches of their Non-Solicitation Agreement;

i.  Award of all damages and relief as agreed to by the parties in the Agreements; and

j.  All other relief at law or in equity to which Marsh is entitled.

Dated:  New York, New York
        May 29, 2025

GIBSON, DUNN & CRUTCHER LLP

By:  /s/ *Harris M. Mufson*

Harris M. Mufson
State Bar Number: 4502522
Danielle J. Moss
State Bar Number: 4996526
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone:  (212) 351-4000
Facsimile:  (212) 351-4035
hmufson@gibsondunn.com
dmoss@gibsondunn.com

Jason C. Schwartz (*Pro Hac Vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539
jschwartz@gibsondunn.com

Karl G. Nelson (*Pro Hac Vice*)
Andrew LeGrand (*Pro Hac Vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue
Suite 2100
Dallas, TX 75201
Telephone:  (214) 698-3100
Facsimile:  (214) 571-2900
knelson@gibsondunn.com
alegrande@gibsondunn.com

*Attorneys for Plaintiff Marsh USA LLC*